| | |
|---|---|
| UNITED STATES OF AMERICA, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | ) **COMPLAINT** |
| SPRAGUE ENERGY CORP., and<br>AXEL JOHNSON, INC., | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

The United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), files this complaint and alleges as follows:

## PRELIMINARY STATEMENT OF THE CASE

1. This is a civil action under Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9607, for recovery of costs incurred and to be incurred in response to releases and threatened releases of hazardous substances at the Old ATC Refinery Site ("Site") in Wilmington, North Carolina. The action also seeks penalties against Axel Johnson, Inc. under Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), for failure to comply with the terms of an Administrative Order on Consent, and punitive damages under Section 107(c)(3), 42 U.S.C. § 9607(c)(3), for failing to properly provide removal action upon an Order of the President.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of and the parties to this action pursuant to Sections 107(a), 109(c), and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a), 9609(c), and 9613(b), and 28 U.S.C. §§ 1331 and 1345.

3. Venue is proper in this district pursuant to Sections 109(c), and 113(b) of CERCLA, 42 U.S.C. §§ 9609(c), 9613(b), and 28 U.S.C. § 1391(b) and (c), because the releases or threatened releases of hazardous substances that give rise to the United States' claim occurred in this district.

## GENERAL ALLEGATIONS

4. The Site is a former petroleum refining and storage facility located on an approximately 13 acre parcel at 801 Surry Street, on the eastern bank of the Cape Fear River in Wilmington, New Hanover County, North Carolina.

5. Defendants Axel Johnson, Inc., ("Axel") and Sprague Energy Corp. ("Sprague"), are corporations organized under the laws of Delaware.

6. Axel and Sprague, through their predecessors-in-interest, Titan Petroleum Inc. and ATC Petroleum, Inc., owned portions of the Site from 1971 to 1974, and operated a petroleum refinery at the Site from 1972 to 1981. Axel and Sprague's predecessors-in-interest continued some operations at the Site until at least 1984.

7. Prior to 1977, the refinery produced premium and regular leaded gasoline from naptha feedstock. In 1977, the refinery began using crude oil as feedstock, ceased production of gasoline, and began producing heavier oils.

8. The feedstock would arrive by ship or barge and was pumped into three large 3.36 million gallon above-ground storage tanks (ASTs). The refinery also received pipeline interface (a mixture of water, lead adulterated gasoline and other grades of petroleum) for refining. The

feedstock was piped via pipelines to the refinery, where it was separated in the fractionation tower. Upon leaving the fractionation tower, products were sent to storage in ASTs. In all, Titan Petroleum and ATC Petroleum maintained twenty-three ASTs at the Old ATC Refining Site with various capacities from several thousand to 3.36 million gallons.

9. Gasoline to be processed was transferred to 42,000 gallon tanks for holding and then to 1,580,000 tanks for blending with dyes and tetraethyl lead (TEL). The TEL was stored in the lead blending shed in a tank and piped into gasoline tanks through a TEL pipeline system. The TEL pipeline system was separate from the remaining pipelines on the site.

10. During the time of operation, the Site also contained refinery equipment, several outbuildings, warehouses, offices, extensive above and below ground piping, waste disposal and burial areas, docks, and loading and storage areas.

11. When oil is stored in ASTs for a period of time, waste materials accumulate on the bottom of the tanks. Water, paraffin, asphaltenes, tank corrosion products, and other materials gradually form a layer of unusable sludge known as "tank bottoms."

12. During the time that defendants' predecessors-in-interest operated the facility, they disposed of sludges generated in the refining process and leaded tank bottoms in part by directly burying the waste on site. These entities also buried lead contaminated piping and drums of waste materials. In addition, leaded scale scraped from the interior of ASTs were raked on the ground by employees of defendants' predecessors-in-interest.

13. When defendants' predecessors-in-interest departed the Site in 1984 or 1985, they left leaded tank bottoms in several of the ASTs.

14. Several entities operated businesses on the Site after defendants' predecessors-in-interest departed the Site in 1984 or 1985. However, none of these entities blended, stored or refined any leaded products. The Site was essentially abandoned in the early 1990s.

15. In the early 1990s, the United States Coast Guard responded, on at least three separate occasions, to releases of oil from leaking tanks, pipelines, and a sludge pile flowing from the Site into the Cape Fear River. Shortly after its last cleanup in the fall of 1992, the Coast Guard referred the Site to EPA for investigation.

16. EPA undertook various investigations of the Site conditions during 1993 and 1994. These investigations revealed abandoned ASTs containing tank bottoms, a sludge pile, leaking pipelines and/or valves; sludge burial areas, a leaking TEL pipeline, a TEL tank, and numerous 55 gallon drums. These investigations also identified eleven areas where there was soil contaminated with metals and polyaromatic hydrocarbons (PAHs).

17. In July 1995, EPA received a report that 2 of the 3.36 million gallon ASTs were leaking. During a site visit, EPA's On Scene Coordinator noted the following: ASTs were leaking along their foundations; 61 scattered 55-gallon drums of cyanides, peroxides, acids, strong bases and flammable liquids; over 200 5-gallon leaking containers of flammable liquids; and strong vapor emanating from the TEL tank.

18. From July-September 1995, EPA conducted an Emergency Removal Action at the Site. During the Action, EPA removed the TEL tank, 61 fifty-five gallon drums and more than 300 five-gallon containers of cyanide, peroxides, acids, bases, and flammable liquids.

19. On October 26, 1995, EPA sent a letter to Axel demanding payment of its costs in conducting cleanup activities at the Site and asking it to undertake additional removal actions at the Site.

20. Axel and EPA conducted further investigations into Site conditions in late 1995 and early 1996. Many of the ASTs were found to contain adulterated crude oil and other materials containing lead levels ranging from 14 parts per million (ppm) to 590 ppm. Also, approximately 150 additional 55-gallon drums or other containers were found in a warehouse

building.

21. In August 1996, Axel and EPA entered into an Administrative Order on Consent ("AOC") pursuant to Sections 104, 106(a), 107, and 122 of CERCLA under which Axel agreed to undertake certain response actions at the Site and to pay EPA $365,000 in reimbursement of past costs EPA had incurred.

22. Axel began work on the Site pursuant to the AOC in November 1996.

23. Although some work was performed at the Site, during the first four months of site work, EPA documented 115 violations of the AOC; four violations of state and federal environmental law; and noted that 35 deliverables were untimely. EPA's On-Scene Coordinators (OSCs) wrote eleven letters to Axel or its agents concerning these conditions.

24. Among the violations of the AOC that were noted by EPA were: a failure to provide a work plan to address contaminated soils under two of the 3.36 million gallon ASTs; seriously late or deficient deliverables, such as the Removal Action Plan; failure to have a contractor on site who was authorized to respond to the requests of the OSCs; delays in removing waste from the Site; failure to timely complete work on pipelines, soils and tanks; failure to set up and properly operate a decontamination station; inability to properly perform air monitoring; unwillingness to follow its own health and safety plan; use of inappropriate protective equipment; receipt of waste on Site without permission of the OSC; draining of waste fluids onto the ground; and a confined space entry without proper safety equipment.

25. On March 25, 1997, EPA invoked the Work Takeover provisions of AOC, which provided that if EPA determined that Axel had ceased implementation of any portion of the Work, was seriously or repeatedly deficient or late in its performance of the Work, or was implementing the Work in a manner which might cause an endangerment to human health or the environment, EPA could assume the performance of Work required under the AOC and the costs

of that Work were to be paid by Axel.

26. Axel requested a hearing under the Dispute Resolution provisions of the AOC.

27. On May 27, 1997, EPA's Waste Division Director issued a written decision upholding EPA's takeover of the work, finding that Axel had repeatedly violated the AOC and had acted in a manner that endangered the safety of individuals at the Site.

28. EPA commenced work on the Site in May or June 1997 and completed its on Site work in October 1999.

29. EPA has incurred over $8 million in cleanup costs at the Site.

30. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section --
. . .

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, . . .

> from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for -- (A) all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan; . . . .

31. "Facility" is defined in CERCLA Section 101(9) as "any building, structure, installation, equipment, pipe or pipeline" or "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed . . . ." 42 U.S.C. § 9601(9).

32. "Release" is defined in CERCLA Section 101(22) as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . . ." 42 U.S.C. § 9601(22).

33. "Disposal" is defined in CERCLA Section 101(29) by reference to the Solid

Case 7:01-cv-00014-F   Document 1   Filed 01/10/01   Page 6 of 12

Waste Disposal Act (SWDA). 42 U.S.C. § 9601(29). The SWDA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

34. "Person" is defined in CERCLA Section 101(21) as "an individual, firm, corporation . . . ." 42 U.S.C. § 9601(21).

35. "Hazardous substance" is defined in CERCLA Section 101(14) by reference to other federal statutes and by reference to a list of substances published by EPA at 40 C.F.R. § 302.4. 42 U.S.C. § 9601(14).

36. "Response," as defined in CERCLA Section 101(25), includes "removal" actions and enforcement activities related thereto. 42 U.S.C. § 9601(25).

37. Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3), provides, in pertinent part:

> If any person who is liable for a release or threat of release of a hazardous substance fails without sufficient cause to properly provide removal or remedial action upon order of the President pursuant to section 9604 or 9606 of this title, such person may be liable to the United States for punitive damages in an amount at least equal to, and not more than three times, the amount of any costs incurred by the Fund as a result of such failure to take proper action.

38. Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), provides, in pertinent part:

> The President may bring an action in the United States district court for the appropriate district to assess and collect a penalty of not more than $25,000 per day for each day during which the violation (or failure or refusal) continues in the case of any of the following –
>
> > (5) Any failure or refusal referred to in section 9622(l) of this title (relating to violations of administrative orders, consent decrees, or agreements under section 9620 of this title).
>
> In the case of a second or subsequent violation (or failure or refusal), the amount of such penalty may be not more than $75,00 for each day during which the violation (or failure

- 7 -

or refusal) continues.

39. Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), was amended by P.L. 104-134 to provide for penalties of not more than $27,500 for first time violations and $82,500 for second or subsequent violations, per day per violation for violations occurring after January 30, 1997. 40 C.F.R. Part 19.

40. Section 122(l) of CERCLA, 42 U.S.C. § 9622(l), provides, in pertinent part:

> A potentially responsible party which is a party to an administrative order or consent decree entered pursuant to an agreement under this section . . . and which fails or refuses to comply with any term or condition of the order, decree or agreement shall be subject to a civil penalty in accordance with section 9609 of this title.

## FIRST CLAIM FOR RELIEF
(Recovery of Response Costs)

41. The allegations contained in paragraphs 1 through 40 are incorporated herein by reference.

42. The Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

43. There has been a "release" and/or threatened "release," as defined by Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), of a hazardous substance at or from the Site.

44. Axel and Sprague are "persons" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

45. Lead, leaded tank bottoms, TEL, API separator sludge, cyanide, acids, bases, peroxides, and flammable liquids are "hazardous substances" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

46. Titan Petroleum, Inc. and ATC Petroleum, Inc. owned and/or operated the Site at the time of disposal of hazardous substances within the meaning of Section 107(a)(2) of

CERCLA, 42 U.S.C. § 9607(a)(2).

47. Axel and Sprague have succeeded to the liabilities of Titan Petroleum, Inc. and ATC Petroleum, Inc.

48. As a result of the release and threatened release of hazardous substances at or from the Site, the United States has incurred and expects to incur "response" costs, as that term is defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

49. The response actions taken by Plaintiff in connection with the Site and, thus, the response costs incurred, are not inconsistent with the National Contingency Plan, 40 C.F.R. Part 300.

50. Axel and Sprague are jointly and severally liable pursuant to Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), to the United States for all costs of response actions taken or funded or to be taken or funded by the United States in connection with the Site. Pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), a declaratory judgment on liability should be entered against Axel and Sprague that will be binding in any subsequent action or actions seeking to recover further response costs or damages incurred by the United States in connection with the Site.

## SECOND CLAIM FOR RELIEF
(Penalties Under CERCLA Section 109(c))

51. The allegations contained in paragraphs 1 through 40; 42-49 are incorporated herein by reference.

52. The AOC constituted an agreement of the President pursuant to Section 122 of CERCLA.

53. Axel failed to comply with the terms of the AOC by its over one hundred documented violations of the Order's terms and the approximately 35 late deliverables.

54. Axel failed to comply with terms and conditions of the AOC, within the meaning

- 9 -

of CERCLA Section 109(c), 42 U.S.C. § 9609(c).

55. Pursuant to CERCLA Section 109(c), 42 U.S.C. § 9609(c), Axel is liable for penalties of not more than $25,000 per day for each day of violation through January 30, 1997, and of not more than $27,500 per day for each day of violation after January 30, 1997, for its first violation of the AOC, and of not more than $75,000 per day for each day of violation through January 30, 1997 and of not more than $82,500 per day for each day of violation after January 30, 1997, for each second or subsequent violation of the AOC.

### THIRD CLAIM FOR RELIEF
(Punitive Damages under CERCLA Section 107(c))

56. The allegations contained in paragraphs 1 through 40; 42-49; 53 are incorporated herein by reference.

57. The AOC constituted an order of the President pursuant to Sections 104 and 106 of CERCLA.

58. Axel's failure to comply with the terms of the AOC constitutes a failure to properly provide removal action.

59. Axel, which is liable for a release or threat of release of a hazardous substance, failed, without sufficient cause, to properly provide removal action within the meaning of 42 U.S.C. 9607(c)(3).

60. Costs were incurred by the Hazardous Substance Superfund as a result of Axel's failure to properly provide removal action, including costs of completing the removal action and enforcement costs.

61. Pursuant to Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3), Axel is liable to the United States, in addition to penalties, for punitive damages in an amount at least equal to, and not more than three times, the amount of any costs incurred as a result of its failure to properly provide removal action.

- 10 -

## PRAYER FOR RELIEF

WHEREFORE, the United States requests that the Court:

1. Enter, against Axel and Sprague, jointly and severally, a judgment for all costs incurred by the United States through the date of judgment, plus interest, pursuant to Section 107, 42 U.S.C. § 9607;

2. Enter against Axel and Sprague, pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), a declaratory judgment that Axel and Sprague are jointly and severally liable, which will be binding on any subsequent action or actions against Axel and/or Sprague seeking to recover further response costs or damages incurred by the United States in connection with the Site; and

3. Enter a judgment against Axel for penalties pursuant to Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), of not more than $25,000 per day for each day of violation through January 30, 1997, and of not more than $27,500 per day for each day of violation after January 30, 1997, for its first violation of the AOC, and of not more than $75,000 per day for each day of violation through January 30, 1997 and of not more than $82,500 per day for each day of violation after January 30, 1997, for each second or subsequent violation of the AOC; and

4. Enter a judgment against Axel for punitive damages, pursuant to Section 107(c)(3), 42 U.S.C. § 9607(c)(3), for Axel's failure to properly provide removal action; and

5. Grant such other relief as the Court deems appropriate.

LOIS J. SCHIFFER
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

*/s/ [signature]*
LORI JONAS
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044
(202) 514-4080
(202) 514-2583 (fax)


JANICE McKENZIE COLE
U.S. Attorney

*/s/ Fenita M. Shepard [signature]*
FENITA M. SHEPHARD
Assistant U.S. Attorney
Office of the U.S. Attorney
310 New Bern Avenue, Suite 800
Federal Building
Raleigh N.C. 27601
(919) 856-4356
(919) 856-4821 (fax)

ATTORNEYS FOR PLAINTIFF
UNITED STATES OF AMERICA


OF COUNSEL:

KEVIN BESWICK
Associate Regional Counsel
U.S. EPA Region 4
Atlanta Federal Center
61 Forsyth Street
Atlanta, Georgia 30303-8960
(404) 562-9580